# ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeal of -- | ) |
| | ) |
| Monica Walker | ) ASBCA No. 60436 |
| | ) |
| Under Contract No. DACA45-5-14-6100 | ) |

APPEARANCE FOR THE APPELLANT:     Ms. Monica Walker

APPEARANCE FOR THE GOVERNMENT:     Thomas H. Gourlay, Jr., Esq.
            Engineer Chief Trial Attorney
        Melissa M. Head, Esq.
            Engineer Trial Attorney
            U.S. Army Engineer District, Omaha

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

In this appeal, decided pursuant to the accelerated procedures of Board Rule 12.3 and on the record without a hearing pursuant to Board Rule 11, we determine what amount of compensation is due to appellant, Ms. Walker, for damage done to a house that she leased to the United States Army Corps of Engineers (the Corps) for use by an Army recruiter and his family. As will be seen, Ms. Walker is entitled to some compensation, but not the full amount that she has sought.

## SUMMARY FINDINGS OF FACT

On 11 August 2010, a Corps real estate contracting officer (CO), executed Lease No. DACA45-5-10-00111 (the initial lease), through which Ms. Walker and Joseph Gordon Hylton (Ms. Walker's now-former husband) provided a house in Waukesha County, Wisconsin (the house), for use by Army Sergeant First Class (SFC) Jose Rodriguez, Jr., and his family (R4, tab 39). The term of the initial lease was one year, from 20 August 2010–19 August 2011, renewable annually at the choice of the Corps until 19 August 2013 (*id.* at 1). The initial lease included a provision for an "INITIAL CONDITION REPORT," through which the parties would jointly inspect the leased premises on or before the effective date of the lease and co-sign a report about the condition of the house (*id.* at 3, ¶ 3). The initial lease also included a provision (the Restoration Clause) requiring a "final joint inspection and condition report" and that, "[u]pon written notice, the lessors may require restoration of the demised premises...to the same condition as that existing at the time of initial occupancy" or payment of money sufficient to make up for the loss of value to the

house caused by any damage to the premises (*id.* at 4, ¶ 13(A)).  This restoration requirement, however, did not extend to "ordinary wear and tear" (*id.*, ¶ 13(B)).

The Corps duly renewed the initial lease annually through 19 August 2014 (*see* R4, tabs 35-37).[1]  On 16 July 2014, the CO sent a letter to Ms. Walker and Mr. Hylton officially terminating the lease, but noting that it would be replaced by Lease No. "DACA455140006100" (the new lease) (R4, tab 34).  This letter also provided that the exit inspection would be performed at the termination of the new lease (*id.*).  The new lease, was, in fact, executed by Mr. Hylton and Ms. Walker on 30 July 2014, and by the CO on 4 August 2014 (R4, tab 33).

The initial lease and the new lease generally contained similar provisions (*compare* R4, tab 39 to R4, tab 33), but the new lease had a slightly different Restoration Clause.  In the new lease, the Restoration Clause explicitly required written notice of "damage beyond normal wear and tear...along with validation of damages" be provided to the government within 30 days of the termination date (R4, tab 33 at 4, ¶ 13(A)).  The Restoration Clause in the new lease also explicitly provided that the government would not restore "the interior paint of the demised premises, when the Government has possessed the leased premises for three or more years prior to the date of the termination" (*id.*, ¶ 13(B)).  The new Restoration Clause also limited the government's payment, when restoration was deemed warranted, to an amount "depreciated for normal wear and tear" reflecting either the amount that the damage decreased the value of the house or the amount necessary to make repairs (*id.*, ¶ 13(C)).  The new lease was modified on 15 May 2015, primarily to reflect Ms. Walker as the sole lessor (R4, tab 32).

On 26 June 2015, the CO sent to Ms. Walker a letter acting as a notice of termination of the lease, effective 19 August 2015 (R4, tab 31).  This termination letter raised the issue of the final joint inspection, stating that it needed to be conducted within five days before the termination date, and include the service member, Ms. Walker, and a government representative from the military service member's office (*id.*).  The letter also informed Ms. Walker that, if she felt damage had occurred "above normal wear and tear," she was to inform the government within 30 days so that they could discuss what was needed to negotiate a final settlement (*id.*).

The walk-through inspection was conducted on 19 August 2015, and Ms. Walker, SFC Rodriguez, and Mr. Keith Falvey from the Corps were in attendance (R4, tabs 22, 23, 26).  The 20-page joint survey was completed at the time and signed by both Ms. Walker

---

[1]  The record does not reflect any change to the initial lease extending its end date to 19 August 2014 from the 19 August 2013 date originally in the initial lease.  The discrepancy, however, is not material to the issues before us.

and Mr. Falvey (*see* R4, tab 26), and multiple photographs were taken by Mr. Falvey. Mr. Falvey wrote up a short memorandum the next day (20 August) including his impression of the state of the home (R4, tab 24). Ms. Walker sent an email to the CO on 20 August 2015 characterizing the amount of "intentional damage" to the house as being "staggering" (R4, tab 22). Attached to this email was a four-page memorandum noting issues observed during the 19 August walkthrough (*id.* at 3-7). On that day, Mr. Falvey sent SFC Melissa Berberian to the house to meet with Ms. Walker and take additional photographs, which she did (R4, tab 42).

On 21 August, Ms. Walker sent the CO another email, detailing comments from a contractor who she had taken through the house for a further examination of the damage to it (R4, tab 20). We will discuss this in more detail below, but the damage to the house reported in this email was more extensive than in Ms. Walker's or Mr. Falvey's earlier assessments (*compare* R4, tab 20 at 1-2 to R4, tabs 22, 24), and included, for the first time, claims that five of the interior doors were seriously damaged (R4, tab 20 at 1-2). In apparent response, on 8 September 2015, SFC Rodriguez provided a slide presentation to the CO setting forth his view of the damage to the house (R4, tab 19).

Ms. Walker's communications with the CO adding further details and allegations of damages continued. On 16 September 2015, Ms. Walker sent a memorandum with photographs to the CO further detailing the damage to the house for which she blamed SFC Rodriguez (R4, tab 18). Ms. Walker sent the CO extensive estimates for repairing the damage on 14 October (R4, tabs 11-15), and an additional list of "other damages" done to the house and appliances on 25 October (R4, tabs 7-9). The 25 October email included 10 itemized components setting forth the "Cost of Vandalism to Home," summing to $21,135.92 (R4, tab 6).[2]

The CO inquired of Ms. Walker if this was the final total for the cost of the damage to the house and asked her for a signed and dated letter if it were so (R4, tab 6). Ms. Walker responded with a signed letter, dated 27 October 2015, resubmitting the $21,135.92 request and included further explanation and cost estimates (R4, tab 5). The CO considered this to be Ms. Walker's claim, pursuant to the Contract Disputes Act (CDA) (R4, tab 2 at 3, ¶ 9). The CO sought and received additional information from SFC Rodriguez (*see* R4, tab 4), as well as from Ms. Walker (*see* R4, tab 3).

On 11 January 2016, the CO issued a final decision (COFD) on Ms. Walker's claim (R4, tab 2). In the COFD, the CO agreed to payment of $4,067.87 of Ms. Walker's claim, which the CO calculated to sum to $22,275.92, rather than the $21,135.92 written on the claim (*id.* at 12). Ms. Walker filed a timely notice of appeal to the Board on 1 February 2016, revising her total damages as indicated below (R4, tab 1 at 1).

---

[2] These components will be set forth below.

<u>The Components of Ms. Walker's Claim</u>

Ms. Walker's claim to the CO that was later appealed to us had 10 components that we will address in more detail below when explaining our decision. Those components, and the CO's decision upon them are as follows (*see* notice of appeal at 1):

| <u>Claim</u> | <u>Amount of Claim</u> | <u>Amount Given by CO</u> |
|---|---|---|
| Kitchen Cabinetry and Labor | $5,075.43 (revised to $4,758.52 in this appeal) | $0 |
| Kitchen Flooring | $1,916 | $1,131 |
| Doors | $4,051 (revised to $2,880.51 in this appeal) | $0 |
| Bathrooms | $1,669 (revised to $2,411 in this appeal) | $160 |
| *Gutter Repair | $1,925 | $0 |
| Garage Door | $999 (revised to $356 in this appeal) | $0 |
| Living Room Carpet | payment of $1,253.28 resolves dispute | |
| Kitchen Appliances | $1,117.59 | $0 |
| *Other Damages | $2,958.80 (revised to $938.80 in this appeal) | $0 |
| Cleaning Costs and Replacing External Locks | payment of $584.79 resolves dispute | |

In Ms. Walker's brief to the Board, however, she added $7,590 for "Paint," apparently excusing its tardiness by noting that "information received [on] 2/25/16" (app. br. at 3). In her brief before the Board she also withdraws the two components of the claim set forth by asterisks, above (app. br. at 58 (gutter repair), at 65 (other damages)).

## DECISION

We evaluate the components of Ms. Walker's serially, but note a number of matters governing our review that apply to all of them. First, despite the accelerated nature of review in this case brought pursuant to Board Rule 12.3, the burden of proof remains upon Ms. Walker as the appellant. That means that she must prove her entitlement to compensation by a preponderance of the evidence, and that unsupported allegations will not do. Second, the damages in this matter are limited by the strictures of the new lease (in particular, the Restoration Clause), which provides that the Corps is not required to pay for normal wear and tear nor to pay more to restore the home than the cost of the restored items depreciated for their normal wear and tear nor for an amount greater than the damage diminished the value of the house.

## I.    Ms. Walker Is Not Entitled to Compensation for Her New "Paint" Claim

For the first time, in her brief to the Board, Ms. Walker requests payment of $7,590 for interior painting (app. br. at 3-8). This was not sought in her claim to the CO, nor referenced in her appeal to the Board (*see* R4, tab 1 (appeal), tab 5 (claim)). In large part, this claim is aimed at the cost of remedying painting of the house performed by SFC Rodriguez that Ms. Walker describes as having been poorly done and without primer (*see generally* app. br. at 4-8). She also notes water damage (*id.* at 6), and the need for minor drywall repair, throughout (*id.* at 4-8).

We deny this portion of Ms. Walker's claim in its entirety for two reasons: First, as the Corps noted, a claim for interior paint damage was never submitted to the CO (*see* gov't br. at 2). Submission of a claim to the CO is a prerequisite to our jurisdiction. *E.g., Northrop Grumman Computing Sys., Inc. v. United States*, 709 F.3d 1107, 1111-12 (Fed. Cir. 2013) (valid claim a jurisdictional prerequisite for legal action). To be sure, Ms. Walker did submit a claim for damage to her house, but that claim did not put the CO on notice that there would be a substantial request for damages due to general painting issues, rather than those that were particularly specified. Although we generally allow some modification of a claim amount to reflect better information as litigation progresses, *see, e.g., Tecom, Inc. v. United States*, 732 F.2d 935, 937-38 (Fed. Cir. 1984); *Newell Clothing Co.*, ASBCA No. 24482, 80-2 BCA ¶ 14,774 at 72,916; *J.F. Shea Co. v. United States*, 4 Cl. Ct. 46, 54 (1983), this tolerance for adjustment to the amount of damages does not extend to a case, like here, in which an entire category of damages is first presented in the final brief on the merits of the appeal. A claim is "new" if it is not "based on a common or related set of operative facts." *See Placeway Constr. Corp. v. United States*, 920 F.2d 903, 907 (Fed. Cir. 1990). Although the painting damages are based upon the alleged mistreatment of the house by SFC Rodriguez, they are different enough from the damages sought in the claim presented to the CO that we would need to

5

adjudicate "new operative facts" to decide them – new operative facts that the CO was not given the opportunity to evaluate. Under these circumstances, the painting damages constitute new claims and we do not possess jurisdiction to consider them. *See Unconventional Concepts, Inc.*, ASBCA No. 56065 *et al.*, 10-1 BCA ¶ 34,340 at 169,591; *see also Santa Fe Engineers, Inc. v. United States*, 818 F.2d 856, 859-60 (Fed. Cir. 1987) ("unrelated problems" to original claims on same contract not properly before the Board).

If we did have jurisdiction, we would deny this portion of Ms. Walker's claim because it is precluded by the new lease. As the Corps correctly contends (*see* gov't br. at 3-4), the Restoration Clause specifically carves out an exception to the Corps' being liable for the cost of interior painting after the house had been occupied by SFC Rodriguez for three years. SFC Rodriguez occupied the home for more than three years, thus, by operation of the new lease, the Corps cannot be held liable for the repainting[3] costs sought here.

## II.    Ms. Walker is Not Entitled to Compensation for the Kitchen Cabinetry

Ms. Walker's kitchen cabinetry claim stems from water damage to the maple cabinetry with granite countertops that had been installed at the house sometime before SFC Rodriguez moved in (*see* app. br. at 9-14). Through photographs, Ms. Walker has demonstrated that there was apparent rot of the wood from water damage under the sink (and water damage that continued to the basement under the sink) and that a "lazy susan" cabinet adjacent to the sink also suffered mechanical damage to its latches, which SFC Rodriguez allegedly attempted to cover up by "flipping" the doors (*id.* at 11). Ms. Walker notes in her brief that her insurance company characterized the damage to the cabinetry as "vandal[ism]" (*id.* at 9). It is not particularly clear from Ms. Walker's brief what she believes to have been the source of the water damage under the sink and how that is SFC Rodriguez's fault, though she blames his failure to turn off the water to the copper pipe to the refrigerator for damage to the refrigerator wall panel (*id.* at 10).

In the end, as the government argues, there is insufficient evidence to support a finding that the water damage was the fault of SFC Rodriguez. The water damage

---

[3] We note that Ms. Walker also seeks "minor drywall repair" within the scope of her repainting claim, but this is part and parcel with the painting job that is precluded by the new lease. Moreover, she did not provide us any separated-out costs for drywall repair so, even if the new lease did not preclude the award of damages for drywall repair (and even if we possessed jurisdiction to consider it – which we do not), we could not make an award compensating Ms. Walker for such damages for lack of proof.

under the sink plainly came from a leak near that location and SFC Rodriguez presented evidence both in his declaration and in email correspondence between himself and Ms. Walker that was attached to the declaration, that there were problems with the sink and that Ms. Walker had sent a plumber to fix it, although there was some delay for parts (R4, tab 43, ¶ 5, tab 43, ex. C). It was also evident that there was a leak behind the refrigerator about which SFC Rodriguez and Ms. Walker communicated (R4, tab 43, ¶ 4, exs. A, B, C). There is no evidence, however, that any of these leaks were the fault of SFC Rodriguez or that any failure to remedy them in a more timely way caused damage that was not already there when the leaks were discovered. Although Ms. Walker appears to allege that the water damage behind the refrigerator came from SFC Rodriguez's replacement of the original refrigerator with one that he purchased (*see* app. br. at 10), she presents no evidence to support this assertion, while the Corps has provided ample proof that the leaking water behind the refrigerator pre-dated SFC Rodriguez's replacing the existing refrigerator with one of his own (*see* R4, tab 43 ¶ 5, ex. A), thus, there is no basis to hold SFC Rodriguez responsible for the consequences of this leak.

With respect to the "flipped over" doors to the "lazy susan," and the broken latch, there is again a lack of evidence that SFC Rodriguez was in any way responsible for this, and the photographic evidence is less than clear that anything was, in fact, broken. There were no comments on this subject on the exit survey (R4, tab 25 at 6), and SFC Rodriguez denied having done anything to those doors in his 14 December 2015 letter to the contracting officer (R4, tab 4 at 45), although we hasten to add that we give SFC Rodriguez's unsworn denial little evidentiary weight (similar to Ms. Walker's unsworn statements). At the end, we have no evidentiary basis to find that SFC Rodriguez did anything to damage the "lazy susan" doors in such a way that the Corps should be held liable for it.

III.     Ms. Walker Is Entitled to Additional Compensation for the Kitchen Flooring

The CO agreed that SFC Rodriguez was responsible for damage done to the hardwood kitchen floor that occurred when he moved the refrigerator, but was only willing to pay $1,131 of the $1,916 requested by Ms. Walker (R4, tab 2 at 5-6). The CO obtained this figure by selecting the lowest bid of the three provided by Ms. Walker for the floor work, submitted by Wicks Wood Floors for $1,140, and subtracting out a $204 component for "water pop floor," which was contingent upon its being found to be necessary at the time of installation (*id.*), leaving $936. The CO then added the cost of moving three appliances at $65 per appliance, which sums to $1,131 (*id.*).

Ms. Walker asserts that four, not three, appliances need to be moved and that the $65 charge was for moving each appliance out of the way, with an additional $65 for moving each back where it belonged after the floor work (*see* app. br. at 20-21).

7

She also requests $150 to reconnect the gas to her clothes dryer and water to her clothes washer, as well as $150 to replace the allegedly damaged copper line to the refrigerator (*id.* at 21). The CO denied the reconnection and copper line costs for lack of support (R4, tab 2 at 5-6) – support which remains lacking in Ms. Walker's brief.

In any event, although we cannot find the $65 charge per appliance in the paperwork provided, the CO apparently found this number somewhere in the correspondence and determined it to be supported (R4, tab 2 at 6). But the $65 per appliance is apparently for moving the appliance out or moving the appliance in to the kitchen, so the appliances need to be counted twice as much as done by the CO. Thus, we double the amount paid for appliance moving to add an additional $195 to the amount agreed to by the CO.[4]

We also believe it appropriate to pay the costs of re-attaching the gas and water lines, but see no evidence of those costs in the documents provided to us. Ms. Walker asserts that plumbing service calls begin at $75 (*see* app. br. at 20), and we are persuaded to assess this amount, even in the absence of further evidence, in view of the fact that there is obviously some charge for this service and note the absence of contrary evidence.

With respect to the copper water pipe to the refrigerator that Ms. Walker states was damaged by SFC Rodriguez, but repaired by a plumber for $150, (*see* app. br. at 20), there is simply no evidence to support either SFC Rodriguez's culpability for such damage or the cost of such repairs. By contrast, SFC Rodriguez has submitted a declaration denying any responsibility for this damage (R4, tab 43, ¶ 5). Accordingly, we award no damages for the refrigerator water pipe.

Finally, like the CO, we agree that there was no evidence presented that the "water pop floor" treatment was necessary, and thus cannot award money for it.

Thus, we add $270 to the amount already found by the CO for damages to the kitchen flooring.

---

[4] Ms. Walker argues that she should also get an additional $65 for the refrigerator that she would move back in (*see* app. br. at 20-21 (three items moved out; four items moved in, adding up to seven)), but, if SFC Rodriguez moved his own refrigerator out of the space upon leaving we are not inclined to award a payment to Ms. Walker for moving hers back in.

IV.    Ms. Walker Is Entitled to a Slightly Depreciated Payment for Three of the Interior Doors

Ms. Walker argues that five interior doors and two storm/screen doors required replacement as a result of mishandling by SFC Rodriguez (*see* app. br. at 25-32).  The Corps denies any responsibility, whatsoever, for the doors (*see* gov't br. at 8-13).  We find the evidence supports a finding that three of the interior doors were so damaged during the time of SFC Rodriguez's residence that the Corps should be held responsible for their replacement.

We will address the five interior doors in the order that they were raised in Ms. Walker's brief.  First, the door to the new master bedroom[5], as is obvious from the photograph included in the brief (*see* app. br. at 25) and the clearer photograph taken by Mr. Falvey during the exit inspection (*see* R4, tab 41, ex. A at 1), is irreparably damaged, far beyond normal wear and tear.  Whether it was "kicked in" as surmised by Ms. Walker (app. br. at 25), or damaged in some other way, it requires replacement.  The Corps argues that the timing of this and all other door claims was "very suspect" (*see* gov't br. at 8), but Ms. Walker's allegations regarding the doors first arose only two days after the first walk-through inspection and, unless we are to believe that Ms. Walker purposefully damaged all of the suspect interior doors immediately after the inspection with the hope of fraudulently obtaining payment from the government for their replacement (a scenario that we find unlikely), we must conclude that the damage to the doors was caused during SFC Rodriguez's tenancy and that the Corps is liable for it, notwithstanding SFC Rodriguez's denial of responsibility for the damage (*see* R4, tab 43, ¶ 4).

Examining the four other interior doors at issue, we determine that two require replacement, while the remaining two appear to have suffered only regular wear and tear, albeit on the heavy side.  The door to the "original master bedroom" is entirely different than the other interior doors and appears to have been recently (and poorly) installed (*see* app. br. at 26-27, photographs).  Inasmuch as this was not noted during

---

[5]  Whether this door was the door to the new master bedroom or the door to the old master bathroom, or even the "main bathroom" is somewhat problematic and confusing.  Ms. Walker avers that it is to the new master bedroom (app. br. at 25), but, after giving both photographs close scrutiny, it is clear to us that the door depicted in Ms. Walker's brief is the same door that Mr. Falvey photographed during the 19 August 2015 exit inspection (*see* R4, tab 41, ex. A at 1).  That door, based upon the exit inspection comments, appears to be the "main bathroom" door that was noted as "coming apart" (R4, tab 26 at 17).  In the end, it makes no difference which door is depicted here because we will only make an award for it once.

the entry inspection (R4, tab 37 at 15, 20) and we believe it more likely than not that such an incongruity would have been given attention at that time, we conclude that this mismatched, poorly installed door requires replacement and that the Corps should bear responsibility for it. Likewise, the multiple holes in the "Front Bedroom" door (*see* app. br. at 28, photographs) are not in any way normal wear and tear, and also require the door's replacement. The evidence supporting replacement of the "Back Bedroom" door, consists of photographs (*see* app. br. at 27) that do not support a conclusion that it has suffered more than ordinary wear and tear, just as photographs of the "Office" door (*see id.* at 29) do not appear to support the assertion that it requires replacement, either. *See W.L. Holbrook*, AGBCA No. 2000-174-1 *et al.*, 03-1 BCA ¶ 32,103 at 158,715 (determination of what constitutes normal wear and tear is a judgment call).

The Corps argues that, notwithstanding any damage to these doors, it should be excused from paying for them because they had depreciated past their useful life (*see* gov't br. at 12-13). To be sure, as noted above, the contract's Restoration Clause requires depreciation for the "normal wear and tear" of items that needed restoration (R4, tab 33 at 4, ¶ 13(C)), but the three doors needing replacement here appear to have had years of useful life ahead of them prior to their suffering the damage that requires their replacement. It would be unreasonable to blindly apply the depreciation table, as requested by the government (gov't br. at 12), to doors whose value remained far greater than zero. Making a judgment call based upon our examination of the photographs of the undamaged doors, we conclude that it would be reasonable to depreciate the value of the doors by one-third. Thus, Ms. Walker is effectively entitled to the cost of replacing two out of the three damaged interior doors. Ms. Walker provided a price of $121.33 per door (R4, tab 5 at 20) for the door, itself, and $235 per door for its staining and installation (*id.* at 19), which we deem reasonable. This sums to $356.33 per door, or $712.66 in total.

The two exterior screen/storm doors that are the subject of the remainder of this portion of Ms. Walker's claim (*see* app. br. at 30), appear to be suffering the type of damage that is unsurprising to encounter upon such doors near the end of their lifetimes. The holes in the front screen/storm door where the pneumatic cylinder has apparently been re-attached on multiple occasions (*see id.*, photographs) are not unfamiliar to homeowners who own such doors that are some years old, as are the doors here. Neither is the damage to the rear screen door beyond the realm of normal wear and tear. The government makes the fair point that the normal lifetime for such doors is about 30 years (*see* gov't br. at 13 (citing R4, tab 16 at 3)), and these doors do, in fact, appear to have been near the end of their useful lives. With this in mind, and because there is absolutely no evidence that the doors were damaged as a result of anything done by SFC Rodriguez during his tenancy, we must deny the storm/screen door portion of Ms. Walker's claim.

10

V.      Ms. Walker Is Entitled to Some Compensation for Damage to the Bathrooms

Simply put, the bathrooms for the master bedroom and the new master bedroom are not pretty. The new master bathroom apparently had issues with lack of ventilation, causing the wallpaper to peel and mold to grow (R4, tabs 24, 26 at 12, tab 43, ¶ 8). Tellingly, Ms. Walker does not dispute this. The original master bathroom does not appear to be in as bad shape, though there was some damage to the sink noted in the inspection (R4, tab 26 at 16).

We turn first to the allegations regarding the new master bathroom, which is referenced as the 2nd Floor MBR Bath in the exit survey (*see* R4, tab 26 at 12). There is mention in the exit survey of the "very poor paint job – paint all over stained molding" (*id.*), and the CO, in fact, determined that Ms. Walker should be compensated $160 for addressing the stained wood trim (R4, tab 2 at 7).[6] Ms. Walker, however, alleges that all of the fixtures in that bathroom need to be replaced, as well as the door and that the walls require repainting (app. br. at 51-53).

There is little evidence to support Ms. Walker's claim that all of the finishes on the bathroom fixtures were "ruined," beyond the assertions in her brief (*see* app. br. at 53). The photographs that she included with her brief were only clear with respect to the lighting fixtures, and the top of the mirror trim (*see id.*). Somewhat better pictures may be seen in Ms. Walker's 16 September 2015 communication to the CO (*see* R4, tab 18 at 13). Notably, SFC Rodriguez did not dispute Ms. Walker's allegations regarding the damage done by the painting in the rebuttal he provided to the CO (R4, tab 4 at 50), although the Corps argues, as does SFC Rodriguez in his declaration, that there is no evidence of damage to the sink and that the photographs purportedly demonstrating paint damage to the mirror merely show crumbling drywall (*see* gov't br. at 14 (citing R4, tab 43, ¶ 8)).

We do not agree with the government's denial of responsibility for the paint damage to the lighting fixtures and the mirror, but will not extend our finding of liability to the other fixtures in this bathroom because there is simply no evidence to support it. Moreover, we also find that it is excessive to characterize the paint damage to these fixtures as "ruining" them. In our judgment, a rough estimate of 50% diminution of value is merited. Ms. Walker provided estimates of replacing the lighting fixtures and mirror which we deem reasonable: $99 for the mirror (R4, tab 5

---

[6] The Corps asserts, in the conclusion of its brief, that it should not be responsible for the $160 awarded by the CO (*see* gov't br. at 17). This conclusory assertion is not supported by evidence or argument and we see no reason to disturb the CO's decision on this point, which is consistent with our finding that SFC Rodriguez's paint job caused damage to some fixtures.

11

at 37); $115 for the labor to replace the mirror (*id.* at 33) and $115 for the labor to replace the light fixture (*id.*), although we do not see any estimated cost for the light fixture, itself. This sums to $329, discounted by 50% to $164.50.

We find the damage to the walls and wallpaper to be the expected ordinary "wear and tear" to a poorly-ventilated bathroom over a period of years, and not the responsibility of the tenant. Moreover, as noted above in the section regarding Ms. Walker's late-added painting claim, the Restoration Clause absolved the Corps of the cost of internal re-painting, which is the remedy that the walls require. Thus, we award no damages for the damaged wallpaper.

With respect to the damage that Ms. Walker argues was done to the interior bathroom door, we do not find that the photographic or other evidence supports a finding that this door was damaged beyond ordinary wear and tear, and thus award no damages for it.

Turning to the original master bathroom, Ms. Walker appears to be requesting the replacement of a damaged door and frame as well as the sink, which she argues was damaged "beyond repair" (app. br. at 54). First, we note that there is no evidence presented of damage to the original master bathroom door. As discussed in footnote 4, there is some documentation of a damaged door, perhaps from one of the bathrooms, but we account for it in the section above dealing with damaged interior doors.

With respect to the damaged sink, we have examined the photographs and are not persuaded that the damage is nearly as severe as Ms. Walker contends (*see* R4, tab 41, ex. A at 20), although it does appear to be beyond normal wear and tear. Ms. Walker requests $450 to replace the sink, but only provides evidence of the labor cost ($275), and not the $175 that she seeks for the sink, itself (*see* app. br. at 55-56). Even had she provided evidence of the sink cost (and the $175 figure strikes us as being in the right ballpark for such an expense), the total would be excessive for the light damage done to the sink's value. We estimate the loss in value to be approximately $150, which is a third of the figure that Ms. Walker requests.

VI.     Ms. Walker Is Not Entitled to Damages for the Garage Door

Ms. Walker next seeks payment for damage to the garage door, which she asserts was caused by "something tall from inside the garage" (app. br. at 58). Her brief presented no evidence of any damage having originated from the interior of the garage, and neither did her claim (*see* R4, tab 5). The 16 September 2015 correspondence to the CO, however, did include photographs of the garage door (*see* R4, tab 18 at 3-4), but although we can discern that the door is partially bent, it is not as clear from the evidence provided that whatever caused the bending came from the

interior of the garage. SFC Rodriguez explained in his declaration that a tree had fallen on the garage door during a storm (R4, tab 43, ¶ 6). Because the tenant would not be responsible for such damage and because there is no evidentiary basis to contradict SFC Rodriguez's declaration, we find no liability against the Corps for the damage to the garage door.

## VII.   Ms. Walker Is Not Entitled to Damages for the Kitchen Appliances

The final claims brought by Ms. Walker involve her kitchen stove and microwave, which she requests be replaced (app. br. at 60). According to Ms. Walker, the microwave "works...but sustained a direct heavy blow to the microwave control panel mechanism so nothing can be cooked in the microwave" (*id.*). Ms. Walker also asserts that the lever to lock the stove door (used during oven cleaning) was broken, and surmises both that the "heavy blow" that damaged the microwave also damaged the stove door, and that this was why the stove had not been cleaned on SFC Rodriguez's departure (*id.*). Both claims are denied for lack of proof.

With respect to the microwave, neither the claim (*see* R4, tab 5 at 55), nor Ms. Walker's brief (app. br. at 60) provided any evidence that the microwave control panel was damaged in the manner that she asserts. Moreover, there was evidence from SFC Rodriguez that the microwave was tested and worked at the time of the inspection (R4, tab 43, ¶ 7), and Ms. Walker confirms that she did test it and it appeared to work at that time (app. br. at 60). In these circumstances, we have no evidentiary basis to believe that the microwave was damaged or that SFC Rodriguez was responsible for it.

The claim regarding the alleged damage to the oven is similar. There is no evidence that a blow of any sort caused the oven cleaning latch to break during SFC Rodriguez's tenancy – which is consistent with SFC Rodriguez's denial of the same (R4, tab 43, ¶ 7). Ms. Walker suggests that the reason that the stove was dirty on SFC Rodriguez's departure was because it was not cleanable due to the broken latch (app. br. at 60). This, however, ignores the fact that the stove was dirty at the time that it was inspected prior to SFC Rodriguez's tenancy (*see* R4, tab 26 at 6). Thus, it is equally conceivable that the cleaning latch was broken when SFC Rodriguez moved in. In any event, even if there were proof that SFC Rodriguez was responsible for the broken latch (used only during self-cleaning), that is hardly cause to justify buying an entirely new replacement oven, and we would consider the diminishment in value occasioned by such damage to an older stove to have been *de minimus*, even were SFC Rodriguez responsible for it, which he was not.

13

## CONCLUSION

In addition to those damages already found by the CO, we sustain Ms. Walker's appeal in the additional amount of $1,297.16 with CDA interest to run from 27 October 2015, the date Ms. Walker's claim was submitted to the CO. This figure represents $270.00 for additional costs related to the kitchen flooring; $712.66 in costs for the interior doors; $164.50 in damages to the new master bathroom; and $150.00 in damages to the original master bathroom. The remainder of the appeal is denied.

Dated: 27 July 2016

J. REID PROUTY
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 60436, Appeal of Monica Walker, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals